# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 05-CR-386 (ESH) |
| | : | |
| ANTOINE JONES, | : | |
| LAWRENCE MAYNARD, | : | |
| KIRK CARTER, and | : | |
| FRANCISCO JAVIER GONZALEZ-RUAN | : | |
| Defendants. | : | |

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' LEGAL MOTIONS

JEFFREY A. TAYLOR
United States Attorney

RACHEL CARLSON LIEBER
JOHN V. GEISE
Assistant United States Attorneys

Pursuant to the arguments set forth in the following omnibus response, and any other arguments which may be made at a hearing on this matter, the United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully opposes the following several pretrial motions in this matter filed by defendants Antoine Jones, Lawrence Maynard, and Francisco Javier Gonzalez-Ruan.

## I.   Factual and Procedural Background

In the fall of 2004, the Safe Streets Task Force, run out of the Washington Field Office of the Federal Bureau of Investigation (FBI), began investigating possible cocaine-trafficking by a District of Columbia night club owner named Antoine Jones.  As extensively detailed in the affidavit in support of a wiretap, having exhausted all reasonably available investigative tools to further their investigation into Jones's drug trafficking, agents obtained Court authorization for a Title III wire intercept on Jones's cellular telephone.  In the course of wire interceptions on Jones's phone, which ran from September 2, 2005, through October 24, 2005, Jones was overheard speaking with various individuals in what investigators interpreted as coded conversations regarding the sale of wholesale quantities of cocaine by Jones to these individuals. In still other conversations, Jones was overheard speaking with three Hispanic men, believed to be Jones's Mexican cocaine suppliers, in what investigators interpreted as coded conversations regarding the shipments of cocaine to the D.C. area, and the timing of meetings at a stash location for Jones to pick up the drugs and drop off cash.

During the course of the 7-week wire interception period, investigators identified several of these individuals whom they believed were wholesale cocaine customers of Jones, along with these three individuals who were part of Jones's Mexico-based supply chain.  Through the use of

1

telephone records, and physical and electronic surveillance – including a global positioning

system device (GPS) which was secreted on Jones's Jeep Grand Cherokee – investigators were

able to identify the residences of many of these suspected customers and of a suspected stash

house where members of the supply chain resided.

Within a few hours of the initiation of the wire interception on September 2, 2005, Jones

spoke with at least four individuals, setting up meetings along the Branch Avenue corridor in

Temple Hills, MD.  In many of those conversations, both on that day and throughout the wire

interception period, Jones discussed the distribution of "tickets," prices for tickets, availability of

the next shipment of tickets, and timing of ticket sales, among other things.  Though a good

code, given Jones's ownership of a club, it quickly became apparent that in fact, Jones and his

colleagues were discussing cocaine transactions.  For example, on October 5, 2005, Jones and an

individual named Michael Huggins spoke in two conversations regarding how many tickets the

defendant had.  In those conversations, Huggins told Jones that he had two tickets, but had sold

one and a half, and now had "about a half left."[1]  Other suspected customers spoke to Jones

about "big tickets," "little tickets," and "big VIPs."  Rounding out the coded conversations were

those between one of the suppliers and Jones in which they discussed the timing of a shipment of

"VIP tickets."

Based on calls between Jones and his suspected Mexican supplier, who utilized a cellular

telephone with a Texas area code, on October 19, 2005, investigators believed that a sizeable

shipment of cocaine was en route to the Washington, D.C., area on the weekend of October 22-

---

[1]       It bears mention that at all times during the wire interception, Huggins was a
plumber, and had no connection to Jones's nightclub other than that on perhaps one occasion, he
fixed a plumbing problem at the club.

23, 2005. A determination was made that the case should be taken down and that load of cocaine intercepted – and so over the course of the ensuing few days, numerous search warrants were prepared and a team of over 100 federal and local law enforcement agents was assembled to execute those warrants. In the early morning hours of October 24, 2005, agents executed 10 search warrants at residences in the District of Maryland, including those of the defendant and Jones, and at Jones's nightclub, Levels, in the District of Columbia. Recovered from Jones's Jeep Grand Cherokee was in excess of $69,000, in cash, bundled up and stashed in various bags; recovered from the residences of various suspected customers were wholesale quantities of cocaine, ranging from 125 grams to 600 grams, large amounts of cash, ranging from $2,700, to over $12,000, along with firearms, digital scales, and other drug packaging paraphernalia. From the suspected stash house in Ft. Washington, MD, agents recovered 97 kilograms of powder cocaine, just under one kilogram of crack cocaine, and in excess of $850,000, in cash.

A number of individuals were arrested that day, including Jones, three suspected Mexican suppliers who resided in the Ft. Washington stash house, and four suspected customers. In the ensuing weeks, three additional defendants were arrested in connection with stand-alone drug conspiracy indictments, arising out of the investigation. A superseding indictment was returned in March, 2006, charging the group with conspiracy to distribute and possess with the intent to distribute cocaine, along with a number of telephone counts. Jones was also charged with two stand-alone possession with intent to distribute counts for specific cocaine sales during the charged conspiracy, which ran from sometime in 2003 through October 24, 2005.

A number of individuals who were arrested in October, 2005, pleaded guilty and agreed to cooperate with the government, including customer John Adams, and supplier Roel Bermea. These cooperating individuals confirmed investigators' belief that "tickets" was code for wholesale quantities of cocaine, and that the many meetings Jones set up with individuals along Branch Avenue and at the nightclub Levels were for the purpose of exchanging cash and cocaine. Further, Bermea verified that the coded calls between his Mexico-based boss and Jones pertained to the timing of the delivery of sizable cocaine shipments, often in the 50+ kilogram range. In addition, Bermea stated that his numerous short conversations with Jones were for the purpose of arranging to meet with Jones to deliver the cocaine.

Based in part on information provided by these cooperating witnesses, the grand jury handed down two superseding indictments, which detailed the manner and means of the conspiracy, set forth numerous overt acts committed by various members in furtherance of the conspiracy, and added additional charges of use of a communications facility in furtherance of drug trafficking, including 32 such counts against defendant Jones.

Trial commenced before this Court against the final five defendants – Jones, Carter, Kevin Holland, Michael Huggins, and Adrian Jackson – on October 16, 2006.[2] After approximately six weeks of testimony and evidence, including fully 300 intercepted wiretap calls, the jury began deliberations, which ran through the Christmas holiday, into January, 2007. During the deliberations process, the jury returned partial verdicts, acquitting defendants Jackson and Holland on all counts. On January 12, 2007, the jury returned verdicts of not guilty on the

---

[2]    As the Court is aware, during jury selection, defendant Carter's case was severed due to a conflict of interest between his counsel and a potential government witness.

conspiracy count and four of the five telephone counts against Mr. Huggins.  They declared themselves unable to reach a unanimous verdict on the final phone count, which the government eventually dismissed at a subsequent hearing, on February 2, 2007.  That same day the jury acquitted defendant Jones on a number of the telephone counts, and was unable to reach a verdict on the drug conspiracy count and the remaining telephone counts.

The government ultimately sought and obtained a final superseding indictment in March, 2007, charging Jones and defendants Lawrence Maynard, Kirk Carter, and Francisco Javier Gonzalez-Ruan, with a single count of conspiracy to distribute cocaine.[3]  As part of that indictment, the indictment enumerated 146 overt acts committed by various conspirators in furtherance of the conspiracy, including many of the calls that underpinned the telephone counts upon which Jones was acquitted at the 2006 trial.  Trial in this matter is set for November 5, 2007.

---

[3]       Lawrence Maynard plead guilty to one count of narcotics conspiracy in June, 2006; however, due to a technical issue, the Court permitted him to withdraw his guilty plea in February, 2007.  Defendant Gonzalez-Ruan – alleged to be a member of the Mexican supply chain – was arrested at the border too close in time to the first trial to include him, so he was incorporated into the second trial plan.  However, he was released erroneously in early May, 2007 – though this Court had issued an appropriate detention order in this case.  Sources indicate that he is now in Mexico, with no intention of returning to the United States.  Further, even if arrested there, the extradition process would take at least six months, and thus, for practical purposes, defendants Jones, Maynard, and Carter are the current trial defendants.

## II. Defendant Jones's Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communication; and Defendant Maynard's Motion to Adopt (Documents 369 and 355)

### A. Jones's Motion (Document 369)

Defendant Jones's "Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications" (document 369) is an essentially verbatim repetition of his "Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications" (document 141) which this Court denied in United States v. Jones, 451 F. Supp. 2d 71 (D.D.C. 2006). There are a few cites to the trial record added and a discussion of one additional case, United States v. Rice, 478 F.3d 704 (6th Cir. 2007). Rather than blocking and moving the relevant passages from the United States' response to the original motion (document 151), the government lists below the section of the initial response where the specific arguments were addressed and the portion of the Court's opinion where the defense arguments were rejected. For ease of comparison, the section designation in Jones's pending motion (document 369) along with the corresponding/identical section in Jones's original motion (document 141) is referenced; in a few places there is also brief discussion of some of the trial testimony cited by Jones. And, finally, there is an analysis of the Rice opinion.

### 1. Challenge to the text messaging search affidavits

These challenges to the text messaging search affidavits were addressed at pages 6-23 of the government's initial response (document 151). This Court discussed and rejected Jones's attacks on the text messaging affidavits in United States v. Jones, 451 F. Supp. 2d at 75-80. The corresponding sections of Jones's pending and original motion are as follows:

6

a. The August 10 Affidavit

i. Oral and written law enforcement reports

Pending motion (document 369) at 3, essentially identical to original motion (document 142) at page 8.

ii. Physical surveillance

Pending motion (document 369) at 3-5, essentially identical to original motion (document 142) at pages 8-11. This section of the pending motion has an excellent illustration of the value of the occasional cites to the trial testimony that have been added to the language from Jones's original motion. For example, in the physical surveillance section of his original motion, Jones alleged that "Agent Yanta intentionally misleads the court and shows a reckless disregard for the truth by minimizing the fact that Maynard was the manager of Levels." Document 142 at 8. In response the United States pointed out that the affidavit in support of the text messaging search warrant specifically states that Maynard was listed as an "A.B.C. manager" at Levels. Document 151 at 17, *citing* Affidavit at 7. This Court found that the affidavit properly disclosed Maynard's role as a manager at Levels. 451 F. Supp. 2d. at 78-89. Despite this finding by the Court, in Jones's pending motion he alleges that "Agent Yanta intentionally misleads the issuing court and shows a reckless disregard for the truth by omitting the fact the Maynard was the manager of Levels ." Document 369 at 3. In support, he cites a portion of the trial transcript that simply verifies what was in the affidavit, that Special Agent Yanta knew that Maynard was a club manager. Id. How this testimony would support changing the earlier ruling of the Court, or would alter the undisputable fact that this was specifically disclosed in the affidavit is never explained.

7

### iii. Review of pen register data

In his initial motion, Jones attacked the affiant's analysis of pen register data. Document 142 at 11-13. That portion of his pleading had several narrative paragraphs, (id. at 11-12), and a listing of the activations between Jones' and Maynard's phones and various other phones (id. at 12-13). The instant motion has essentially identical narrative paragraphs without the listing of activations. Document 369 at 5-6. This Court rejected that challenge. 451 F. Supp.2d at 79.

Again illustrating the value of Jones's cites to the trial testimony, he points to a discussion with Special Agent Yanta that simply recites the same activation numbers that were relied on in his initial motion. Document 369 at 6. How this adds to, or supplements, or should alter the Court's earlier ruling, is simply never explained, nor can it be.

### iv. vehicle registration records

Pending motion (document 369) at 6, essentially identical to original motion (document 142) at page 14.

### v. review of criminal records

Pending motion (document 369) at 7, essentially identical to original motion (document 142) at page 14.

### vi. debriefing of informants

Pending motion (document 369) at 7-8, essentially identical to original motion (document 142) at pages 15-16.

### b. The August 18 affidavit

Pending motion (document 369) at 8-9, essentially identical to original motion (document 142) at pages 15-16.

## 2.   Challenges to the Title III  Affidavits

These challenges to Title III affidavits were addressed at pages  23-35 of the government's initial response (document 151).  This Court discussed, and rejected, Jones's attacks on the Title III affidavits.  Jones, 451 F. Supp. 2d at 79-84.  The corresponding sections of Jones's pending and original motion are as follows:

a.  law enforcement reports

Pending motion (document 369) at 10, essentially identical to original motion (document 142) at page 17.

b.  surveillance

Pending motion (document 369) at 10, essentially identical to original motion (document 142) at page 17.

c.  review of pen register data

Pending motion (document 369) at 10, essentially identical to original motion (document 142) at pages 15-16, albeit that the specific breakdown of number of activations that occupies two pages in the original motion has been omitted in the instant motion.

d.  vehicle registration records

Pending motion (document 369) at 10-11, essentially identical to original motion (document 142) at page 19.

e.  criminal history

Pending motion (document 369) at 11, essentially identical to original motion (document 142) at page 19.

f. debriefing of confidential informants

Pending motion (document 369) at 11, essentially identical to original motion (document 142) at page 19.

g. text messages

Pending motion (document 369) at 11-13, essentially identical to original motion (document 142) at pages 20-21.

h. other investigative techniques

Pending motion (document 369) at 13-16, essentially identical to original motion (document 142) at page 21-24. This section of the pending motion does have a new reference to Harold Holden. The possible availability of Holden as an informant was raised in Maynard's suppression motion and is discussed *infra* in response to that motion.

i. The Rice opinion

Jones does cite one new case in his pending suppression motion, United States v. Rice, 478 F.3d 704 (6th Cir. 2007). Rice, of course, is not binding authority in this circuit. And, the government suggests, the dissent in Rice, 478 F.3d at 715-18, has the better of the argument. But even putting all of that aside, the Rice Court affirmed suppression of a Title III intercept in a context where the trial court had found that: (a) the affidavit in support of the intercept implied that surveillance had occurred when it did not, and was reckless in doing so (id. at 707, 709); (b) the discussion of confidential sources was merely generic boiler plate (id. at 708); and (c) the wire intercept was used as the first step in the investigation (id. at 709). In contrast, this Court has already found that: (a) Special Agent Yanta's affidavits contained no statements that were intentionally misleading or made with reckless disregard for the truth (451 F. Supp.2d at 79); (b)

10

that any alleged misstatements were immaterial to the probable cause finding (id.); (c) that the affidavit provided specific information about how the operation of the Jones organization limited the effectiveness of conventional techniques (id. at 83); and, (d) that the intercept was only undertaken after a broad range of other techniques had been tried and appropriately found wanting (id. at 82). Thus Rice, on the facts, simply has no application here.[4]

### B. **Maynard Motion to Adopt (Document 355 at 4-8)**

Maynard's wiretap motion makes two challenges to the affidavits in support of the wire intercepts. First, he alleges that the affidavit contained merely boilerplate assertions (document 355 at 5-6). As discussed above, this Court has already considered and rejected that allegation, finding that Special Agent Yanta's affidavit provided specific information about how the operation of the Jones organization limited the effectiveness of conventional techniques. Jones, 451 F.Supp.2d at 83.

The second argument advanced by Maynard is that Harold Holden was an intimate of Jones, that Holden could have been the "eyes and ears" of the government, that Holden must have been cooperating with the government with a major focus on Jones, and that "Agent Yanta failed to spell out the details about Holden for fear that the request for a wiretap might be denied" (document 355 at 4-8). Based on these allegations, Maynard contends that the Court should hold a Franks hearing concerning the failure of the affidavit to specifically discuss

---

[4] One other point should be made concerning Rice. The Rice Court held that the "good faith" exception to suppression does not apply to Title III. 478 F.2d at 711. However, Rice itself recognized that the weight of authority is to the contrary. Id. at 713-14. See United States v. Brewer, 204 Fed.Appx. 205, 208 (4th Cir. 2006) (good faith exception applies to Title III); United States v. Moore, 41 F.3d 370, 376 (8th Cir. 1994) (same); United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988) (same); United States v. Gotti, 42 F. Supp.2d 252, 267 (S.D.N.Y. 1999) (same). The government maintains that the majority rule is the correct one.

Holden as a possible cooperator.

This Court, in this very case, has outlined the showing necessary for a defendant to

obtain a <u>Franks</u> hearing:

> The rule set forth in <u>Franks</u>, however, "has a limited scope, both in regard
> to when exclusion of the seized evidence is mandated, and when a hearing
> on allegations of misstatements must be accorded." <u>Id</u>. (citation omitted).
> As the D.C. Circuit has instructed, "a defendant is entitled to an
> evidentiary hearing only if his attack on the accuracy of the affidavit is
> 'more than conclusory' and is accompanied by 'allegations of deliberate
> falsehood or of reckless disregard for the truth, and those allegations must
> be accompanied by an offer of proof.' " <u>United States v. Gaston</u>, 357 F.3d
> 77, 80 (D.C. Cir. 2004) (*quoting* <u>Franks</u>, 438 U.S. at 171) (emphasis
> added). Furthermore, even if the defendant makes the requisite
> preliminary showing, a hearing is not required unless the alleged
> misstatement was material to the finding of probable cause.

<u>Jones</u>, 451 F. Supp. 2d at 78.

As to the first prong, Maynard's claims here are classically conclusory. He bases his

allegations on the following logic: first, since the proceeding involving Holden is sealed, he must

have entered into a plea; second, it must have been a cooperation plea focusing on Jones; third,

Holden would have been able to significantly further the investigation; and, fourth, Special

Agent Yanta must have known of this and deliberately withheld it in order to obtain the wire

intercept. [5] Maynard presents nothing approaching an offer of proof, other than that Holden was

---

[5] As discussed in this section, Maynard fails to make a showing that would justify any
evidentiary hearing on this point. However, as a factual matter, during the period up to and
including the wire intercept, to the extent Special Agent Yanta was aware of the name Harold
Holden, it would have been in the context of one of the many names that subscriber information
showed belonged to phones calling Jones or being called by Jones. It was only after October 24,
2005, that Special Agent Yanta learned that Holden was affiliated with Levels and Jones and that
he had been arrested some time before for a drug offense. It would also have been subsequent to
October 24, 2005, that investigators fully connected Holden to one of the voices heard on the
wire intercept.

involved in a sealed matter concerning his drug arrest and that he was employed at Levels. Even if one indulges the assumption that Holden had agreed to cooperate based on the fact of the sealed proceeding, there is no offer of proof that his cooperation involved Jones, or that Special Agent Yanta was aware of Holden's cooperation, or that he might have information concerning Jones or Levels. See id., 451 F. Supp. 2d at 79 (denying request for Franks hearing in first round of motions in this case because even if omissions had occurred, defendant "offered no proof that Special Agent Yanta made such misstatements or omissions with the requisite scienter – namely, that she intentionally tried to deceive the issuing court or manifested a reckless disregard for the truth").

        As to the second prong of a Franks analysis – materiality – the affidavit laid out in considerable detail why informants and/or an undercover operation were unlikely to be able to expose the full scope of the Jones organization in a fashion that would likely lead to a successful prosecution of the entire organization (September 2 affidavit at 54, 56). And it was the purpose of the investigation to pursue not just Jones and his immediate network, but also his suppliers and the profits of his illegal activity (September 2 affidavit at 51-52 ¶ 93); Jones, 451 F.Supp. 2d at 82. The affidavit pointed out in particular that Jones was very suspicious of individuals who had been arrested and might thus be cooperating, id. at 54, the very position Holden would have been in based on the representations in Maynard's motion. Def Mot. at 6. In short, even if one were to assume that Holden was a possible cooperator against Jones known to the agents prior to the interception, his existence would not have defeated the necessity for the interception since "a reasoned review of a wiretap request must take into account the added difficulty, expense, and danger of using informants, especially those concurrently charged with other crimes . . . ."

                                            13

United States v. Canales Gomez, 358 F.3d 1221, 1227 (9th Cir. 2004) (reversing district court suppression of wire intercept on ground that informants had not been sufficiently pursued as an alternate investigative technique).

## III. Jones Motion to Suppress Tangible Evidence from Defendant's Jail Cell (Document 371)

On November 25, 2005, FBI Special Agents Jimmy F. Pope, Jr., Stephen R. Naugle, and John C. Bevington executed a search warrant on the cell of Antoine Jones in the D.C. Jail. Jones claims that the search violated his Fourth Amendment rights and that the seizure of certain items violated his Sixth Amendment right to counsel. Jones's claims fail for several reasons. As to the Fourth Amendment claim, the items seized were taken pursuant to a valid warrant and Jones had no protected Fourth Amendment interest in his cell. As to the Sixth Amendment claim, Jones must establish that the seized materials, clearly within the scope of the warrant on their face, were privileged material, something he has failed to do.

### A. Jones had no protected Fourth Amendment interest in his cell.

Citing Cohen v. United States, 796 F.2d 20, 23-24 (2d Cir.1986), Jones argues that even though he was a prisoner, he had a protected Fourth Amendment interest in the contents of his jail cell. Cohen does hold that pre-trial detainees have some Fourth Amendment protection in their cells, at least where the search is by non-jail personnel for reasons unrelated to the needs of prison security.[6] However, the weight of well-reasoned authority is to the contrary. State v.

---

[6]        In Cohen, the "search was initiated solely to obtain information for a superseding indictment." 796 F.2d at 24. Here, by contrast, the possibility of ongoing drug activity and witness intimidation, are legitimate prison security concerns. Even if some Fourth Amendment protection applies to pre-trial detainees, it would not extend to evidence of ongoing witness intimidation or drug activity. See People v. Davis, 115 P.3d 417, 430 (Cal. 2005) (even if pre-trial detainee had some privacy interest, protection of possible witness would be legitimate

Apelt, 861 P.2d 634, 641, 649 (Arizona 1993) (Fourth Amendment does not apply to search of pre-trial detainee's cell); People v. Davis, 115 P.3d 417,  428-29 (Cal. 2005) (agreeing with the jurisdictions that find no legitimate expectation of privacy for pretrial detainees); State v. O'Rourke, 792 A.2d 262, 263, 267 (Maine 2001) (Fourth Amendment does not apply to search of pre-trial detainee's jail locker); People v. Phillips, 555 N.W. 2d 742, 743 (Mich.App. 1996) (Fourth Amendment does not apply to search of pre-trial detainee's cell); State v. Martin, 367 S.E. 2d 618, 621 (N.C. 1988) (same); State v. Andujar, 899 A.2d 1209, 1224  (R.I. 2006) (agreeing with the jurisdictions that interpret Supreme Court decisions to "leave no room for any legitimate expectation of privacy for pretrial detainees regardless of the purpose motivating the search").

### B.  The search was conducted pursuant to a valid warrant

Even if there were some Fourth Amendment protected interest in the items in Jones's cell, the search was conducted pursuant to a valid warrant.  A judicial officer's task in reviewing a search warrant affidavit for probable cause "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U. S. 213, 238 (1983); see also United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993), citing Gates.  Courts accord great deference to the issuing magistrate's determination of probable cause.  See United States v. Johnson, 437 F.3d 69, 71 (D.C. Cir. 2006); United States v. Webb, 255 F.3d 890, 904 (D.C. Cir. 2001); United States v. Hodge, 246 F.3d 301, 305 (3d

security interest justifying warrantless search).

Cir. 2001) (Alito, J.) (a reviewing court "give[s] great deference to the [issuing] judge's probable cause determination."). A reviewing court examines only "whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984); Thomas, 989 F.2d at 1254. Thus, "although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109 (1965). Indeed, "[e]ven if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard." United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993)

The affidavit in support of the search warrant must be read in its entirety and in a common-sense and nontechnical manner. Gates, 462 U.S. at 230-31. Evaluated in that light, the affidavit here contained ample facts to support Magistrate Judge Kay's finding of probable cause to believe that evidence of wrongdoing would be found in Jones's cell. The information presented in Detective Horne's affidavit demonstrated three facts that established probable cause to think that Jones would have evidence in his cell relating to obstruction of justice and drug trafficking: first, that Jones and Lawrence Maynard had been actively involved in drug activity together; second, that they were involved in ongoing communications regarding that activity despite Jones's incarceration; and third, that Jones was likely to have material related to these discussions in his possession.

16

As to the first point – evidence of a prior active drug conspiracy involving Maynard and Jones – the affidavit laid out information supplied by informants detailing Maynard's role as trusted lieutenant and drug courier for Jones (affidavit at 5-7); the stop of Maynard in North Carolina with over $67,000, concealed in a hidden compartment in Jones's mini-van, along with pen register activity contemporaneous with the stop linking Maynard to Jones's possible drug sources (affidavit at 7-9); wire intercepts confirming Maynard's role as Jones's confidant in the drug business (affidavit at 9-11); and the major seizures of drugs and money on October 24, 2005, confirming the extent of the drug activity (affidavit at 11).   This left little question that if Jones trusted anyone in his drug organization, it was Maynard.

As to the second point – ongoing activity – the affidavit laid out a number of phone calls Jones had made while incarcerated at the D.C. Jail.[7]  In several to Deborah O'Neal, a romantic interest,  Jones indicated that he was sending her letters addressed to others, which she was supposed to give to "Lawrence" because he would know what to do with them (affidavit at 12). Jones told O'Neal to urge Maynard to visit Jones in the jail so he would not "be in the blind" (affidavit at 12).  In conversations with his wife, Jones also asked  her to contact Maynard for him and urged her to have Maynard visit him at the jail (affidavit at 12).

---

[7]     Jones, in a footnote to his motion, without any supporting authority, suggests that these conversations should be suppressed because they were not obtained with a subpoena or warrant.  Def. Mot. at 371 n.1.  The conversations at issue are recordings made by the jail of conversations on phones used by prisoners kept in the hands of jail officials as part of a public policy of monitoring inmate calls, including signs above the phones indicating that they may be recorded.  It is difficult to understand how Jones could have any protected Fourth Amendment interest in these recordings and Title III specifically excludes this kind of monitoring from its coverage.  Smith v. Department of Justice, 251 F.3d 1047, 1049 (D.C. Cir. 2001).

Detective Horne's affidavit put this activity in context: "[i]t is a common practice of drug traffickers who are incarcerated to reach out to associates who remain in the community to continue their illegal drug trafficking activities while incarcerated, including attempts to influence witnesses and arrange for the concealing or destruction of evidence. Such outreach takes many forms, including telephone calls from the jail, and letters containing instructions regarding the manner in which to continue the business." (Affidavit at 4). Magistrate Judge Kay could appropriately rely on Detective Horne's opinion in assessing these contacts. United States v. Laws, 808 F.2d 92, 103 (D.C. Cir. 1986) ("law-enforcement officers may draw upon their expertise in translating activity that appears innocuous to the untrained mind into grounds supporting a search or arrest warrant").

The final point is reason to believe that Jones would have evidence of this activity in his cell. As a general proposition, the Court of Appeals for this Circuit has consistently held that observations of illegal activity can provide probable cause for the issuance of a search warrant for a suspect's "home," even in the absence of direct evidence that illegal activity occurred in the "home." Johnson, 437 F.3d at 71-72 (upholding search warrant for defendant's home, although no direct evidence of drug activity in the house, based on proof that a resident in the house was an active drug dealer and expert opinion that drug traffickers frequently keep contraband and items of evidentiary value at their residences); Thomas, 989 F.2d at 1254-1255 (substantial evidence supported finding of probable cause to issue warrant to search defendant's house for illegal drugs, even though police officer's affidavit in support of application for search warrant offered no direct evidence that criminal activity occurred at defendant's house; affidavit stated that officer had received information from reliable informant that defendant was selling cocaine

and heroin in another quadrant of the city, and affiant stated that in his experience drug dealers frequently kept business records, narcotics, proceeds from sales, and firearms in their homes).

Here, the affiant, a seasoned drug investigator, stated that, based on her expertise and training, "inmates frequently maintain letters, notebooks, phone books, family photographs and other notations in their cell and among their personal property. Examination of this material can provide investigators with the identity of persons close to the inmate, including co-defendants and persons willing to commit criminal acts for the defendant. Inmates will also utilize the inner-jail mail system to correspond with other family members and friends, and in this correspondence, as well as in normal correspondence, will discuss or allude to criminal activity, often using slang or code. Additionally, the affiant knows that if an inmate writes on a pad, and then mails or destroys what he has written, chemical analysis of that pad can often reveal what was written." (Affidavit at 4). Magistrate Judge Kay was entitled to "give considerable weight to the conclusions of this experienced law enforcement officer regarding where evidence of a crime was likely to be found." Hodge, *supra*, 246 F.3d at 307 (internal citation, quotation marks, and punctuation omitted); United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999) (not unreasonable for judicial officer to have relied upon common sense buttressed by affiant's opinion as a law-enforcement officer that defendant would be likely to keep proceeds from his drug trafficking and records relating to drug transactions at his apartment); United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996) (conclusion of experienced law-enforcement officer regarding where evidence is to be found may be given "considerable weight" by an issuing judge). Thus, Magistrate Judge Kay's finding that there was probable cause for the search, like the same findings based on similar investigator expertise upheld in Johnson and Thomas, was entirely

appropriate.

Even if the affidavit had failed to establish probable cause – which is not the case –
Jones's challenge to the affidavit and ensuing demand for suppression nonetheless would fail
because the agents reasonably relied upon the warrant's validity.[8]  Where a warrant erroneously
issues despite a lack of probable cause in the supporting affidavit, the "marginal or nonexistent
benefits produced by suppressing evidence obtained in objectively reasonable reliance on a
subsequently invalidated search warrant cannot justify the substantial costs of suppression."
United States v. Leon, 468 U.S. 897, 922 (1984).

### C.  No privileged communications were seized

Jones alleges that certain of the items seized from his cell are protected by the attorney client
privilege.  As already discussed, the search of Jones's cell, which he shared with another inmate,
was conducted by Special Agents Pope, Naugle, and Bevington.[9]  The seized items of which

---

[8]      Ordinarily, the existence of a warrant establishes that the officers acted in good
faith in conducting the search. Leon, 468 U.S. at 922.  Of course, reliance on the warrant will not
preclude suppression if "a reasonably well trained officer would have known that the search was
illegal despite the magistrate's authorization." Id. at 922 n. 23.  Given the authority already
discussed, there was absolutely no reason that the officers here should have thought that the
warrant was lacking in probable cause.

[9]      Jones asserts on "information and belief" that a taint team procedure was not followed.
He bases this conclusion on the fact that copies of the seized documents were faxed to defense
counsel by one of the Assistant United States Attorneys handling this case, demonstrating, in his
view, that the items seized from his cell were not kept by a taint team. Def. Mot. at 8.  This logic
misses the point of a "taint team," which is supposed to screen out privileged materials and
provide the rest of the seized items to the agents and prosecutors handling the case.  It would
make very little sense for the "taint team" to retain non-privileged material responsive to the
search warrant so  the investigating agents would never become aware of them or be able to
utilize them. (cont'd)

Jones complains, appended hereto as Attachment A, are two pages which, on their face, do not appear to be addressed to or meant for a lawyer.[10]  The first page, A-1, is a "to do" list with various items crossed off as completed.  The second page, A-2, is more of a phone listing and names with question marks, an apparent attempt to make some kind of judgement about the individuals named.  Indeed, these pages look exactly like the kind of things that a defendant might have to keep track of potential witnesses to influence and the telephone numbers of those who might help in that process.

---

In fact,  Special Agent Yanta and Detective Horne did not participate in the cell search to avoid the possibility that they would inadvertently see privileged items.  The seizing agents consciously attempted to avoid taking any privileged material and an Assistant United States Attorney uninvolved in this investigation reviewed the seized documents to screen out any privileged material.  And, at any rate, the defendant would not have any enforceable right in an internal government procedure concerning the handling of documents.  United States v. Caceres, 440 U.S. 741, 755 (1979) (agency violation of its own regulations does not provide grounds for suppression in a criminal prosecution).

[10]    The failure to designate these pages as attorney-client material, when kept in a cell with another prisoner, in and of itself constitutes a waiver of any privilege.  United States v. Horowitz, 482 F.2d 72, 82 (2d Cir. 1973) (rejecting claim of attorney-client privilege when filing cabinets containing the materials were left in the hands of a third party: "one measure of their continuing confidentiality is the degree of care exhibited in their keeping, and the risk of insufficient precaution must rest with the party claiming the privilege") (Friendly, J.); Bower v. Weisman, 669 F.Supp. 602, 606 (S.D.N.Y. 1987) (rejecting claim of attorney-client privilege: "while not quite as careless as communicating in an elevator, leaving a document out on a table (as opposed to putting it in a briefcase or in a drawer) in a public room in a suite in which another person is staying is insufficient to demonstrate [the claimant's] objective interest in its confidentiality); United States v. Hoffman, 422 F.Supp. 475, 476 (S.D.N.Y. 1976) ("By placing the documents in the public hallway outside of [the attorney's] office, the [attorney-client] privilege which might [have] existed with respect to the papers was totally destroyed."). Obviously a prisoner cannot be expected to maintain the same degree of control over documents in his possession as a major law firm, but certainly some kind of marking or annotation is possible, and that was not done here.

As such, they were clearly responsive to the search warrant, which was based on a affidavit that recognized that "[i]t is a common practice for drug traffickers who are incarcerated to reach out to associates in the community" for a number of reasons "including attempts to influence witnesses." Search Warrant Affidavit at 4. And, given that, the warrant sought exactly what these two pages are, "letters, notebooks, phone books, family photographs and other notations in their cell . . . [that] can provide investigators with the identity of persons close to the inmate, including co-defendants and persons willing to commit criminal acts for the defendant." Id.

Jones now contends that these two pages are privileged, having been made at the request of his counsel who instructed him to prepare a list of potential witnesses and cooperators. Def. Mot. at 8. To prevail on this claim, the defendant will have to "prove conclusively each element of the privilege." Independent Petrochemical Corp v. Aetna, 672 F. Supp. 1, 4 (D.D.C. 1986), aff'd, 944 F.2d 940 (D.C. Cir. 1991). The elements he must demonstrate are well known:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In Re Sealed Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984) (quotation marks and citation omitted).

The defendant will have to make this showing despite evidence that he was attempting to locate individuals he apparently believed to be informants, (see Search Warrant Affidavit at 11-12 (describing attempts to communicate with Lawrence Maynard including using a third party to

transmit letters); Attachment A-5 (letter to Jones seized during the cell search describing possible location of potential cooperating witnesses)),[11] and the pages themselves, which on their face do not appear to be a communication to counsel.   This he simply cannot do.

## IV.   Jones Motion to Compel Production or Alternatively to Preclude (Document 372)

Jones requests the production of certain pen register applications and orders citing Federal Rule of Criminal Procedure 16(a)(1)(E).  The United States has a request pending with the Clerk of this Court for the August 1, 2005, application and order and will provide them to defense counsel when received.  Similarly, the United States will provide copies of any pen register applications and orders from the ICE investigation to the extent they are available.

However, it should be noted that it is very doubtful that these applications and orders are discoverable under Rule 16, let alone that the failure to produce them would lead, as  Jones suggests, to the preclusion of evidence derived from the pen registers.  Def. Mot. at 2.  As an initial matter,   there is no Fourth Amendment protection for information obtained through a pen register.  Smith v. Maryland, 442 U.S. 735, 745-46 (1979) ("[I]nstallation and use of a pen register [is] not a 'search' and no warrant was required").  And even a failure to comply with the pen register statute, 18 U.S.C. § 3121 et. seq., carries no suppression remedy.  United States v. Fregoso, 60 F.3d 1314, 1320 (8th Cir. 1995) ("the statutory scheme (which is the same for trap and trace devices as for pen registers) does not mandate exclusion of evidence for violations of

---

[11] Defendant does not allege that he was told by his attorney to attempt to locate possible cooperating witnesses.  While anything is possible, given the well known history of witness intimidation and worse in drug prosecutions in the District of Columbia and the availability of paid investigators for appointed counsel, it seems extraordinarily unlikely that responsible counsel would directed an incarcerated defendant in a large drug case to reach out to his street contacts in an attempt to find the physical location of possible cooperating witnesses.

the statutory requirements"); <u>United States v. Thompson</u>, 936 F.2d 1249, 1252 (11th Cir. 1991)

("[a]bsent a specific reference to an exclusionary rule, it is not appropriate for the courts to read

such a provision into the [pen register] act.").  Finally, the application for a pen register order

contains no statement of facts by a potential witness that might in some way be of assistance  to

the defense, since all that is required in a pen register application is a "certification by the

applicant that the information likely to be obtained is relevant to an ongoing criminal

investigation." 18 U.S.C. § 3122(b)(2).

  Federal Rule of Criminal Procedure 16(a)(1)(E) requires the disclosure of documents that

are material to the preparation of the defense, or are going to be introduced in the government's

case-in-chief, or were obtained from the defendant.  Clearly on their face neither of the latter two

categories apply to a pen register application and order, which will not be introduced into

evidence and certainly were not obtained from the defendant.  As to the first category, it is hard

to see how an application and order, which has no relevance to the admission or exclusion of

evidence and contains no factual statements of any witness, could be  material to the defense.

<u>See United States v. Lloyd</u>, 992 F.2d 348, 351-52 (D.C. Cir. 1993) (to be material under Rule 16,

"[t]here must be some indication that pretrial disclosure of the disputed evidence would [enable]

the defendant to significantly alter the quantum of proof in his favor") (citation and internal

quotation marks omitted).

**V.**    **Jones's Motion to Exclude Evidence Related to Prior Acquitted Conduct and to Strike Overt Acts from the Indictment (Document 370)**

Defendant Jones urges this Court to strike overt acts and exclude evidence pertaining to the acquitted telephone counts, claiming that "the acquittals involve ultimate issues that have already been conclusively determined adversely to the government." Def. Mot at 5, *quoting* United States v. James, 119 F.3d 597, 601 (9ᵗʰ Cir. 1997), a case notable if only because the Ninth Circuit *upheld* the defendant's convictions under analogous circumstances.  In support of his argument, the defendant asserts that a Fifth Amendment violation would occur if the government introduced into evidence in the instant trial the telephone calls which formed the basis of the telephone counts on which he was acquitted in the first trial.  While the defendant is correct that the government is seeking to introduce against him numerous such calls in the retrial of the conspiracy count, for which these calls serve as overt acts, he misapprehends the law in this area – which allows for precisely this: "our precedents hold that a mere overlap in proof between two prosecutions does not establish a double jeopardy violation" (United States v. Felix, 503 U.S. 378, 386 (1992)) – and thus, his motion should be denied.

**A.**    **The law of collateral estoppel**

The law of collateral estoppel is perhaps best defined in the seminal case of Ashe v. Swenson, 397 U.S. 436, 443 (1970): "[w]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  In the criminal context, as the defendant points out, this doctrine takes on constitutional implications in the context of the Fifth Amendment's Double Jeopardy Clause. Def. Mot. At 2-3, *citing*, *inter alia,* Abney v. United States, 431 U.S. 651, 661 (1977).

The Court need look no further than the principal case upon which defendant Jones relies

25

in denying the defendant's motion to preclude evidence related to prior acquitted conduct –
United States v. Lukens, 114 F.3d 1220 (D.C. Cir. 1997).  In that case, defendant Lukens was
tried on a five count indictment, charging him with conspiracy to engage in bribery, and four
additional counts of accepting bribes – one count each for four separate questionable checks –
each of which was separately listed as an overt act in furtherance of the conspiracy.  At an initial
trial, the jury acquitted the defendant as to three of the four substantive bribery counts and hung
on the additional bribery count and the conspiracy count.  A short time later, a new indictment
was filed, charging Lukens again with conspiracy to accept bribes and the remaining substantive
bribery count.

The parallels to the Jones case don't end there.  At the second trial, over the defendant's
objection on collateral estoppel grounds, the government introduced evidence relating to the
conduct underlying the three acquitted counts, contending that the payments at issue in those
counts were overt acts in furtherance of the bribery conspiracy.  He was convicted on both
counts at the retrial, and on appeal claimed that when the jury acquitted him on the three
substantive bribery counts in the first trial, it "actually decided" that he had not conspired to
accept bribes with respect to those three checks, (id. at 1221) – just as Jones now asserts that the
jury in his first trial "has already determined that the acquitted conduct was not carried out as
part of the commission of the conspiracy."  Def. Mot. at 5.

The Lukens court, in denying the defendant's claims of error and affirming his

convictions, used language perfectly applicable here:

> We disagree. Lukens has not demonstrate[d] that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.
>
> The jury in the first trial acquitted Lukens of the bribery charges in Counts 3-5. That jury "actually decided" only that as to these payments the government was not able to prove all of the elements of the bribery charge beyond a reasonable doubt. We cannot say for certain which part of the charge the jury believed the government did not adequately prove. Looking at the evidence that was presented in the case, however, it is clear that the jury did not base its finding on a belief that the payments were never made. Lukens admitted that the payments were made, but claimed that they were loans rather than bribes.
>
> The government's use of the evidence of the three payments in the second trial was not inconsistent with the first jury's findings. The government was not relitigating the question whether the payments were independently illegal. It argued rather that these payments were overt acts in furtherance of the charged conspiracy. It also used the evidence to establish the background pattern of the relationship between Lukens and his alleged co-conspirators. An act need not be independently illegal in order to qualify as an overt act for the purposes of a conspiracy charge. It need only be an act to effect the object of the conspiracy. The first jury never decided that the payments in question did not satisfy this definition. The district court did not err, therefore, in admitting evidence of those payments in the second trial.

Id. at 1221-1222 (internal quotations omitted), *citing, inter alia,* Dowling v. United States, 493

U.S. 342, 350 (to prevail on collateral estoppel motion, defendant must establish that "the issue

whose relitigation he seeks to foreclose was actually decided in the first proceeding"); Ashe v.

Swensen, *supra*, 397 U.S. at 444 ("[w]here a previous judgment of acquittal was based upon a

general verdict . . . a [court] must examine the record of [the] prior proceeding, taking into

account the pleadings, evidence, charge, and other relevant matter, and conclude whether a

rational jury could have grounded its verdict upon an issue other than that which the defendant

seeks to foreclose from consideration"); United States v. Tarantino, 846 F.2d 1384, 1404 (D.C.

Cir.), *cert. denied*, 488 U.S. 867 (1988) ("[c]learly many acts that are by themselves perfectly

legal may constitute overt acts manifesting participation in an illegal conspiracy"); and United

States v. Irvin, 787 F.2d 1506, 1514-16 (11th Cir. 1986) (allowing acquitted conduct to be used as

evidence of overt act for conspiracy charge).

      Here is how that passage might be rewritten, tailored to the facts of the Jones case:

> We disagree. [Jones] has not demonstrate[d] that the issue whose
> relitigation he seeks to foreclose was actually decided in the first
> proceeding.
>
> The jury in the first trial acquitted [Jones of some of the telephone counts].
> That jury "actually decided" only that as to these [telephone calls] the
> government was not able to prove all of the elements of the [telephone
> counts] beyond a reasonable doubt.  We cannot say for certain which part
> of the charge the jury believed the government did not adequately prove.
> Looking at the evidence that was presented in the case, however, it is clear
> that the jury did not base its finding on a belief that the [phone calls] were
> never made.  [Jones did not dispute that the telephone calls] were made,
> but claimed that they were for [legitimate, rather than cocaine, business].
>
> The government's use of the evidence of the [telephone calls] in the
> second trial was not inconsistent with the first jury's findings.  The
> government [will] not relitigat[e] the question whether the [telephone
> calls] were independently illegal.  It [will] argue[ ] rather that these [calls]
> were overt acts in furtherance of the charged conspiracy.  It [will] also
> use[ ] the evidence to establish the background pattern of the relationship
> between [Jones] and his alleged co-conspirators.  An act need not be
> independently illegal in order to qualify as an overt act for the purposes of
> a conspiracy charge.  It need only be an act to effect the object of
> conspiracy.  The first jury never decided that the [telephone calls] in
> question did not satisfy this definition.  The district court [would] not err,
> therefore, in admitting evidence of those [calls] in the second trial.

      Finally, the Supreme Court has long-held that "[c]onspiracies are separate and distinct

from the acts done in furtherance of them, [and] the same overt acts charged in a conspiracy may

also be charged and proved as substantive offenses."  United States v. Burns, 990 F.2d 1426,

1435 (4th Cir. 1993), *quoting* United States v. Bayer, 331 U.S. 532, 542 (1947) (internal

quotation omitted), and *citing* United States v. Felix, 503 U.S. 378 (1992) (reaffirming Bayer; "a

substantive crime and a conspiracy to commit that crime are not the 'same offense' for double

jeopardy purposes").[12]

## VI.    Jones's Motion to Suppress Tangible Evidence from 9719 Summit Circle, Apt. 3B, Largo, MD (Document 373)

Jones next urges the Court to preclude testimony regarding observations made by

Immigration and Customs Enforcement (ICE) agents at an apartment he rented in 2004, located

at 9719 Summit Circle, in Largo, Maryland, claiming that "the ICE agents conducted a

warrantless search and there were not exceptions to the warrant requirement." Def. Mot. at 2.

Thus, he posits, such testimony and any tangible evidence seized should be suppressed as "fruit

of the poisonous tree." Because by engaging in criminal activity on the premises, the defendant

violated the express provisions of his lease, the rental manager could – and did – authorize the

agents' entry, and thus this motion, too, must be denied.

### A.  Factual Background

Sometime in early February, 2004, ICE agents from the Baltimore field office were

alerted by their colleagues in the McAllen, Texas, field office that a man named Francisco Javier

---

[12]    Indeed, unlike a conspiracy charged pursuant to the general conspiracy statute, 18 U.S.C. § 371, a narcotics conspiracy does not require that the government prove an overt act at all. 21 U.S.C. § 846.

Gonzalez-Ruan was at that moment on a flight from Harlingen, Texas, to Baltimore Washington

International Airport (BWI).  The purpose of his visit, according to an ICE McAllen source, was

to pick up proceeds from cocaine sales, totaling two million dollars, in the

Baltimore/Washington, D.C. region.  ICE McAllen provided a physical description of Gonzalez-

Ruan and faxed a photo to ICE agents at BWI, who immediately set up surveillance at the gate.

Shortly thereafter, they positively identified Gonzalez-Ruan, and began multi-agent surveillance

of him, as he moved through the terminal, out of the airport, and on to various places in Anne

Arundel and Prince George's Counties, in the company of at least two other Hispanic men.

Gonzalez-Ruan eventually ended up for the evening at an apartment at the Summit Circle

apartments in Largo, Maryland.  As Gonzalez-Ruan entered an apartment in this garden-style

apartment complex, agents were able to determine that he went to the 3rd floor of the building at

9719 Summit Circle, but were unsure whether he entered apartment 3A or 3B.

Surveillance continued around the clock, into the following day, when two of the

Hispanic men were observed departing the apartment and traveling to Arundel Mills Mall.

Gonzalez-Ruan was also observed that day going outside the apartment and talking on his

cellular telephone.  At some point late in the day, the men were seen leaving the Summit Circle

apartment in a hurry.  Gonzalez-Ruan and a few of the men left the apartment complex in the

silver Chevy Impala that picked Gonzalez-Ruan up the night before at BWI.  Another man was

picked up in front of the apartment a short time later by a black Cadillac registered to Jones.

Based on the information from the McAllen source that Gonzalez-Ruan had come to the

area to pick up substantial cash proceeds from cocaine sales, and their observations of the

comings and goings to the apartment, ICE agents on the scene began to investigate the apartment

further.  They spoke with a maintenance man who told them that the apartment was frequented

by four Hispanic males, and that the silver Chevy Impala – which had Delaware temporary tags

and was registered to Guadalupe Barrone in Texas – was frequently parked in the garage space

for the apartment.  They also spoke with the rental manager of the complex by telephone, and

explained to him the basis of their concerns about illegal narcotics activity being conducted in

that apartment, and a concern about the presence of illegal aliens.  The rental manager gave the

agents access to the rental records, which indicated that apartment 3B was rented by Antoine

Jones.  Finally, the rental manager told the ICE agents that, based on what he had been told

regarding the drug investigation, Jones had violated his lease.  Invoking sections 15 and 19 of the

lease, the manager permitted the agents to enter the apartment in the company of the

maintenance man.  These provisions, appended hereto as Attachment B, read as follows:

> 15.  USE OF PREMISES: You shall use the Premises for residential purposes
> only, and You shall not permit the Premises to be used in any unlawful manner or
> in any manner that may in Our exclusive judgment to [sic] be disturbing to others
> or for any purpose which in Our judgment may injure the reputation, safety or
> welfare of the Premises or this Apartment Community. . . .
>
> 19.  LESSORS RIGHT OF ENTRY: We reserve the right to enter the Premises at
> reasonable times for purposes such as (a) inspecting the condition and making
> such repairs, alterations, or improvements to the Premises, or any adjacent
> apartments, as we consider necessary or desirable, . . . .  Furthermore, We at any
> time reserve the right to enter the Premises to protect life and prevent damage to
> the Premises.

Based upon this authorization, ICE agents accompanied the maintenance man back to the

apartment and entered it for the purposes of investigating whether there were any illegal drugs,

large amounts of cash, or illegal aliens within the apartment.  Once inside, the agents observed

the following things of note: a devotional candle still burning on a counter top, air mattresses,

31

several empty duffel bags in a closet and empty gun boxes.  The agents remained in the

apartment for a few minutes and then left the premises.

### B.  Legal Argument

Defendant Jones is correct – ordinarily, a landlord does not possess "common authority"

to permit warrantless entry by law enforcement agents into a tennant's apartment.  See generally

Def. Mot. at 7-8, collecting cases.  The government does not quarrel with the authority defendant

Jones cites; rather, those cases are inapposite under these circumstances: as set forth above, the

lease which Jones signed expressly provided for entry under precisely these circumstances –

where the management company had reason to believe, based both on law enforcement

information, and the observations of its employee, that Jones had violated his lease by engaging

in criminal activity, or permitting criminal activity to take place, in his rented apartment.

See B.H.A. v. Guirola, 575 N.E.2d 1100, 1105 (Mass. 1991) (manager of apartment complex

could consent to law enforcement search of apartment under lease provision allowing entry for

emergency purposes when manager learned that drugs and guns were present in the apartment);

cf. United States v. Jones, 451 F.Supp 2d 71, 89 (D.D.C. 2006) (Huvelle, J.) ("common authority

is defined as joint access or control for most purposes, such that the owner has assumed the risk

that another might consent to a search of the shared item"), *quoting* United States v. Matlock,

415 U.S. 164, 171 n. 7 (internal quotation marks omitted).   Further, in that lease, Jones

expressly gave up his right to challenge the determination of what constitutes a violation: "You

shall not permit the Premises to be used in any unlawful manner or in any manner that **in Our**

**exclusive judgment** to be disturbing to others or for any purpose which **in Our judgment** may

injure the reputation, safety or welfare of the Premises or this Apartment Community."  Lease

provision 19 (emphasis added).  It was the judgment of the rental manager that Jones was

probably engaging in illegal activity in the apartment, and so he authorized the agents to go in

and look around – a determination supported by both the law and the lease.

## VII.    Jones's Pro Se Motions

Defendant Jones's final motion is in fact a series of *pro se* motions, claiming variously

that the Court erred in denying his motion to suppress evidence derived from the GPS tracker,

that the Court erred in denying his motion to suppress evidence seized from the search of his

Moore Street house on October 24, 2005, that the Court erred in denying his motion to suppress

evidence seized from his Jeep Grand Cherokee that day, and finally that the government engaged

in prosecutorial misconduct.  See generally Jones's Motion for Leave to File Defendant's Pro Se

Motions (Document 368).  These claims should be dismissed out of hand.

As an initial matter, the Court has carefully considered – and denied – many of the claims

that defendant now renews, when his able counsel first filed those motions in advance of the

October, 2006, initial trial in this matter.  United States v. Jones, 451 F.Supp.2d 71 (D.D.C.

2006).  Jones alleges no new facts or circumstances, but rather merely rehashes claims already

made, albeit with perhaps a bit more flourish.  Further, notwithstanding the Court's careful

consideration and denial thereof, Jones's able attorney has renewed many of these misconduct

claims this time around, which the government opposes more fully in section II, *supra*.  See

Defendant's Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from

Interception of Wire Communications and Seizure of Electronic Communication (Document

369).  And finally, to the extent that Jones does raise new claims of misconduct, the government

notes that these are no more than a renewal of the *ad hominem* attacks on government counsel

and the investigating agents that defendant Jones raises in his civil law suits against these defendants in their personal capacities – Stephanie Yanta, Norma Horne, Rachel Lieber, John Geise, and Stephen Kirschner – in which he is seeking $1 million from each party (see Jones v. Stephanie E. Yanta, et. al, 07-CV-1172 (HHK).  For all these reasons, Jones's *pro se* motions, too, should be denied.

## VIII.  Maynard's Motion for Rule 14 Severance (Document 356)

Defendant Maynard seeks a severance based on the supposed disparity of evidence between him and his co-defendants.  Def. Mot. (Document 356) at 1-2.  It is true that Rule 14 of the Federal Rules of Criminal Procedure permits a court to grant a severance motion "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants."  However, a trial court's denial of a severance request will be reviewed under an abuse of discretion standard, and will be reversed only if it appears that the defendant did not get a fair trial.  United States v. Manner, 887 F.2d 317, 324 (D.C. Cir. 1989).

In general – and particularly in conspiracy cases – this Court should strike a balance in favor of joint trials.  Zafiro v. United States, 506 U. S.534, 541 (1993).  A properly joined defendant is not entitled to severance merely on the ground that he played a lesser role in the offense than others.  United States v. Butler, 822 F.2d 1191, 1194 (D.C. Cir. 1987).  In effect, a

> trial judge is given great latitude to balance the institutional benefits that joint trials confer by preserving judicial and prosecutorial resources against the possibility that a defendant will be erroneously convicted because the cumulation of the evidence against all the defendants may lead the jury to be either confused or prejudiced in assessing the evidence against that particular defendant . . . .  Instructions to the jury to consider the evidence separately against each defendant, . . . provide significant safeguards against the dangers of prejudice.

Id. at 1193.

Even if some prejudice from joinder exists, Rule 14 leaves the tailoring of relief to be granted, if any, to this Court's sound discretion. Zafiro, 506 U. S. at 541. Rule 14 does not require that a severance be granted merely because a defendant "'might have a better chance of acquittal if tried separately.'" Manner, 887 F.2d at 324 (citation omitted); see also United States v. White, 116 F.3d 903, 917 (D.C. Cir. 1997) (notwithstanding appellant's involvement in fewer overt acts than co-defendants, disparity in roles not so great as to require severance where there was independent evidence of appellant selling crack as part of the conspiracy); United States v. Long, 905 F.2d 1572, 1581 (D.C. Cir.1990) (no disparity of evidence necessitating severance where there was abundant evidence implicating defendant); United States v. Sutton, 801 F.2d 1346, 1363 (D.C. Cir. 1986) (rejecting argument that "[t]he tidal wave of evidence" caught defendant in "an undertow" and holding that defendant "was drowned by other evidence which proved his direct involvement in the conspiracy and substantive offenses") (emphasis in original); United States v. Bruner, 657 F.2d 1278, 1290 (D.C. Cir. 1981) (although evidence against co-defendant was substantial, there was independent and substantial evidence against defendant as well); cf. Manner, 887 F.2d at 324 ("[J]ury instructions are usually sufficient to minimize any disparities in evidence"; finding no prejudice from introduction of other crimes evidence applicable to co-defendant where judge instructed jury it must not consider that evidence with respect to defendant "in any way"); Butler, 822 F.2d at 1194 (same).

The Court here has the advantage of having heard much of the testimony that will be presented at this trial, albeit that Maynard was not a defendant in the prior trial. Thus, the Court knows that the evidence will show that he was a trusted assistant to Jones in the drug business.

35

In particular, the seizure in North Carolina of over $60,000, from a hidden compartment in Jones's vehicle being driven by Maynard, lends powerful support to other testimony concerning Maynard's involvement. There is simply not the kind of disparity of evidence here that would justify a severance.

## IX.    Maynard's Motion to Suppress Evidence of the Durham, North Carolina Traffic Stop (Document 357)

Defendant Maynard next moves this Court to suppress the substantial amount of cash recovered from a minivan he was driving in Durham, North Carolina, on April 5, 2005, claiming that both the stop of Maynard, and subsequent search, were invalid.  Because the Durham officers had a right, indeed a duty, to stop the speeding Maynard, and had subsequent authority to search on two independent bases – Maynard's consent and the drug dog's alert – this stop and search was proper, and his argument fails.

### A.  Factual Background

As the Court heard last fall from Officer Frederick Whitehead (see generally 11/1/06-AMTR-1-57), on April 5, 2005, the Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a traffic stop of Jones's 1997 Honda Odyssey mini-van, which was being driven by defendant Maynard with Derrick Gordon in the front passenger seat.  Whitehead and other interdiction members questioned Maynard and Gordon, who gave conflicting stories regarding where they were headed and why.  Based on these differing explanations and Maynard's fidgety behavior, Whitehead asked Maynard for consent to search the van, which Maynard granted.  Prior to the execution of the consensual search, a certified interdiction unit canine was called to the scene, and alerted on the right rear passenger area of the mini-van.  A search of the mini-van revealed a hidden compartment in the van, which contained six white

36

plastic Target shopping bags, containing a total of $67,115.00, in U.S. currency, in various denominations, held together by rubber bands. When interviewed by the Interdiction Unit, both Maynard and Gordon denied any knowledge of the secret compartment and the money contained therein. The Honda Odyssey was impounded, the $67,115.00, was seized as evidence, Maynard received a warning ticket, and then was released without additional charges.

**B.   The officers had a right to stop Maynard for speeding.**

In the early afternoon on April 5, 2005, Officer Whitehead was sitting in his marked cruiser on the side of a Highway 85 work zone, with a radar gun in his car, trying to catch speeders. At approximately 2:25 p.m., Maynard sped past him at a high rate of speed. Officer Whitehead estimated his excessive speed, and then confirmed it with his radar gun at 67 miles per hour in a 55 zone. He then turned on his lights and sirens, and pulled Maynard over. Defendant Maynard does not, indeed can not, posit any substantive challenge to this stop, instead simply stating in wholly conclusory fashion that "we expect that the evidence will demonstrate that the government cannot justify the seizure of the defendant's person in that there was no legal basis for the traffic stop." Def. Mot. at 3. The Court should dismiss this challenge out of hand.

**C.   Maynard consented to the search of the minivan.**

Next, Maynard urges this Court to suppress the evidence seized from the minivan because he "expect[s] that the evidence will demonstrate that . . . the defendant did not voluntarily consent to the search of the minivan." Id. Again, Maynard provides no factual basis

for this bald claim, and it, too, should be disregarded by this Court.[13]

**D.    The narcotics-sniffing canine alert provided independent probable cause to search the minivan.**

Finally, even assuming that Maynard could somehow convince the Court that his consent was invalid, he cannot challenge the independent probable cause basis for the search – the canine hit.  See Government's Omnibus Opposition to Defendant Jones's 2006 Pretrial Motions (Document 142) at 60-63, collecting cases for proposition that in light of the canine's training and certification, his bark established probable cause to believe that there were narcotics in Jones's minivan, so the officers had the authority to both search the vehicle and seize the contraband inside.

Indeed, Maynard doesn't even try.  Instead, he claims that "the 'alert' itself was a product of the illegal seizure and detention of defendant's person, and thus is a 'fruit of the poisonous tree' under Wong Sun v. United States, 371 U.S. 471, 488 (1963)."  Because, as set forth above, the stop of the defendant was justified by his speeding through a work zone, and his subsequent detention was justified by his nervous behavior, and conflicting responses, this argument fails as well.

**X.    Maynard's Motion to Suppress Evidence of the 8550 Myrtle Avenue, Bowie, Maryland, Search (Document 358)**

In his final pretrial motion, defendant Maynard asks this Court to suppress evidence, or more specifically observations and photographs, derived from the execution of a "sneak and peek" search warrant at a residence he rented, located at 8550 Myrtle Avenue, in Bowie, MD.

---

[13]    Indeed, as the Court has had the benefit of hearing, first-hand, the details of the stop, search and seizure, from Officer Whitehead, this empty claim is particularly frivolous.

His primary contention is that because the agents never gave Maynard notice of the execution of the warrant, as required by Federal Rule of Criminal Procedure 41, the fruits of that warrant should be suppressed. This argument fails for two reasons: (1) because by the time notice was required, Maynard was no longer a resident of the property, the notice given to the management company was sufficient; and (2) even if this Court were to determine that specific notice to Maynard was required, suppression is not a remedy under Rule 41.

### A.     Factual Background

As more specifically set forth *supra*, in February 2004, ICE agents from Baltimore were investigating possible cocaine trafficking by a Mexican National named Francisco Javier Gonzalez-Ruan. In the course of their investigation into Gonzalez-Ruan, the agents observed Gonzalez-Ruan frequenting an apartment in the Summit Circle apartment complex, rented by defendant Antoine Jones. Also in February, 2004, by technological means, ICE agents linked Gonzalez-Ruan to a house located at 8550 Myrtle Avenue, Bowie, MD, rented by Lawrence Maynard. Based on their concerns about the presence of illegal drugs and currency derived therefrom in the Myrtle Avenue house, agents applied for and obtained a search warrant from United States Magistrate Judge Paul W. Grimm, of the District of Maryland, on February 27, 2004. Further, given her concerns about notifying Maynard, Jones, and Gonzalez-Ruan about the pending investigation, Special Agent Katerina Gikas sought permission to delay notice pursuant to the "sneak and peek" provision of 18 U.S.C. § 3103a(b), which provides that notice may be delayed if the court finds "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result, . . . and the warrant provides for the giving of such notice within a reasonable period not to exceed 30 days after the

date of its execution, or on a later date certain if the facts of the case justify a longer period of delay."

That same day, Special Agent Gikas and other ICE agents executed the warrant. Once they got inside the house, which took some effort, they observed a setting similar to what agents had observed in Jones's Summit Circle apartment: air mattresses, devotional candles, and empty duffel bags, which they photographed. They also noted that all of the windows were covered by sheets, blankets, and in some cases, aluminum foil.

In the early morning hours of February 28, 2004, Gonzalez-Ruan and several other individuals were observed entering the Myrtle Avenue house. After approximately 30 minutes inside, Gonzalez-Ruan and the other people were seen fleeing the house at a high rate of speed in a black Ford Expedition – presumably because they noticed the signs of forced entry in the basement. ICE agents pursued the Expedition down interstate 95, eventually breaking off the chase after VA state police ultimately pulled the car over.

Two days later, on March 2, 2004, defendant Maynard sent a letter to the management company, Remax 2000, terminating his six-month lease effective immediately. He claimed that his employer, Thomas Brown Agency – which later was revealed to be a fictitious entity – had laid him off, and thus he was no longer able to pay his rent.

Within the 30-day notice period, indeed, within a day of the search, ICE agents notified the rental company management of the search, and what they had observed. Special Agent Gikas, concerned that she fulfill her notice obligations, actually spoke with Magistrate Judge Grimm at the time of the search warrant return on March 5, 2004, about whether or not she was

required to give notice to defendant Maynard.  Magistrate Grimm told her that, because Maynard had vacated the premises within the 30 day period of delay, no notice to Maynard was required. Based on this ruling from the issuing magistrate, Special Agent Gikas did not give Maynard notice of the search.

**B.    Notice to Maynard was not required.**

Defendant Maynard is correct – ICE never notified Maynard that the house he was renting had been searched by agents on February 27, 2004.  However, as noted above, such notice was not required, given that Maynard had vacated the residence, and the management company was notified.  While careful searching could find no reported case with facts similar to these unusual circumstances, Magistrate Grimm's ruling makes sense: Maynard had effectively abandoned the property within the initial 30 day delay period, thus the only party left to be notified was the management company, Remax 2000.

**C.    Special Agent Gikas relied on Magistrate Judge Grimm's advice in good faith.**

Even if this Court were to decide that Magistrate Grimm was incorrect, and that notice to defendant Maynard was required, Special Agent Gikas relied on the advice of Magistrate Grimm in good faith, and thus suppression is not appropriate.  See  generally United States v. Leon, 468 U.S. 897 (1984) (when agents rely in good faith on a faulty search warrant, otherwise applicable remedy of exclusionary rule does not apply).  Guidance in this unusual circumstance can be found in the Ninth Circuit case United States v. Johns, 948 F.2d 599 (9th Cir. 1991).  In that case, agents obtained a sneak and peek warrant for a rented storage locker within the Kernville Mini-Storage facility in Kernville, California.  When the agents sought the warrant, they informed the magistrate that they intended to delay notice for an indefinite period of time after the search.

The magistrate approved the warrant and required only that they return to him an inventory of the items they photographed, with no additional notice requirement. Agents executed the warrant and photographed its contents – chemicals and glassware associated with the manufacture of methamphetamine. A few months later, after observing the comings and goings to and from the storage facility, they identified another storage facility, searched it, and arrested the occupants. At that time, the agents notified the defendants that they had searched the locker they had rented at the Kernville Mini-Storage facility as well.

The Ninth Circuit held that, while the magistrate was simply wrong in authorizing the agents to delay notice indefinitely, evidence derived from the search should not be excluded because the agents relied in good faith on the magistrate's erroneous ruling. Id. at 605-606, citing United States v. Freitas, 856 F.2d 1425, 1431 (9th Cir. 1988) (Freitas II). The Court relied on another "good faith exception" case, Massachusetts v. Shephard, 468 U.S. 981 (1984) – where an officer had prepared an affidavit for a search warrant, which a prosecutor reviewed and approved for presentation to the magistrate; then the magistrate made an independent probable cause finding, and approved the warrant, which contained clerical errors. There, as here, the agents "took every step that could reasonably be expected of them" (Johns, 948 F.2d at 605, citing Shephard, 468 U.S. at 989) – indeed Agent Gikas specifically sought the magistrate's advice, to be sure that she fulfilled her duties. In language equally applicable here, the Supreme Court reasoned:

> An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the clerical mistake. The exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.

Id. at 989, *citing* Illinois v. Gates, 464 U.S. 213, 263 (1983) (White, J., concurring in judgment) (internal quotation marks omitted).

> **D.    Suppression is not a remedy in any event.**

Finally, suppression would not be a remedy in any event, because if a violation at all, the failure to give Maynard notice (1) is not a constitutional one, (2) the defendant was not prejudiced by a failure to notify him, and (3) the agent's failure to give such notice was not deliberate or in bad faith.  See United States v. Simons, 206 F.3d 392, 402-403 (4th Cir. 2000);

In Simons, the searching agents failed to leave a copy of the warrant or an inventory of the property seized.  The Fourth Circuit first examined whether such an omission was a violation of constitutional proportions, and concluded that it was not.  Id. at 403 (failure to leave these documents "did not render the search unreasonable under the Fourth Amendment," which does not mention notice).  The next question, then, is whether the defendant was prejudiced by this failure of notice.  Id. (noting in n. 13, that in this case the defendant did not in fact maintain that he was so prejudiced).  Here, there can be no question that had Maynard known that federal agents were looking for Mexicans, cocaine, and money in his rented house, he might have given a second thought as to whether to continue his drug dealing.  However, this is the only prejudice that might inure to Maynard, and it is undoubtedly not the "prejudice" contemplated by the law. Finally, the Court should consider whether the agents violated the notice requirement deliberately or in bad faith.  Id.  Here there can be no question that they did not – indeed, as noted above, Agent Gikas went out of her way to ensure that she was meeting her obligations when she consulted with the issuing magistrate regarding whether notice to Maynard was required.  Cf. United States v. Hurwitz, 459 F.3d 463, 472 (4th Cir. 2006), *citing* United States v.

<u>Chadwick</u>, 433 U.S. 1, 9 (1977) (a sufficiently particular warrant "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search").  In rejecting the defendant's claim in analogous circumstances, the <u>Hurwitz</u> Court stated:

> [T]he Fourth Amendment is not offended where the executing officer fails to leave a copy of the search warrant following the search, or fails even to carry the warrant during the search.  The requirement of particular description does not protect an interest in monitoring searches or engaging the police in a debate about the warrant.  Rather, the Constitution protects property owners . . . by interposing, *ex ante*, the deliberate, impartial judgment of a judicial officer" and "by providing, *ex post*, a right to suppress evidence improperly obtained."

<u>Id</u>.

For all these reasons, Maynard's motion must fail.

**XI.    Gonzalez-Ruan's Pretrial Motions (Document 363)**

Finally, with respect to defendant Francisco Javier Gonzalez-Ruan's several motions, the government respectfully requests that the Court hold these motions in abeyance until such time as the defendant is present in this jurisdiction.   As the Court is aware, the Correctional Treatment Facility erroneously released Gonzalez-Ruan in early May, 2007.  Government sources in Mexico have confirmed that, not surprisingly, he is currently residing in Mexico, with no intention of returning to the United States any time soon.  Government counsel has been in touch in recent months with the United States Marshals Service and the Department of Justice's Office of International Affairs to determine a likely timetable for the defendant's return to this jurisdiction.  We have learned that even if the defendant were arrested on the outstanding fugitive warrant in Mexico today, he would not be presented in the District of Columbia for at

least six months, and that rapidly only if he waived extradition.  For this reason, the government

respectfully requests that the Court hold his motions in abeyance until that time.

**XII.    <u>Conclusion</u>**

WHEREFORE, the United States of America respectfully requests that the defendants'

several motions be DENIED.



Respectfully submitted,

Jeffrey A. Taylor,
United States Attorney


By:_____
John V. Geise
D.C. Bar No. 358267
Rachel Carlson Lieber
D.C. Bar No. 456491
Assistant United States Attorneys
555 4th Street, NW, Room 8445
Washington, DC 20530
(202) 514-7121
John.Geise@usdo.gov
Rachel.Lieber@usdoj.gov